STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2019 CA 0811

JERRY LEE BALDWIN

VERSUS

THE BOARD OF SUPERVISORS FOR THE UNIVERSITY OF
LOUISIANA SYSTEM, THE UNIVERSITY OF LOUISIANA AT
LAFAYETTE, AND NELSON SCHEXNAYDER, INDIVIDUALLY,
AND IN HIS CAPACITY AS DIRECTOR OF ATHLETICS FOR THE
UNIVERSITY OF LOUISIANA AT LAFAYETTE

Judgment Rendered: **FEB 2 1 2020**

* * * * *

On Appeal from the
19th Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
Trial Court No. 509,900

Honorable Timothy E. Kelley, Judge Presiding

* * * * *

G. Karl Bernard
New Orleans, LA

Attorney for Plaintiff-Appellant,
Jerry Lee Baldwin

Honorable Jeff Landry
Attorney General
Stephen J. Oats
Lawrence E. Marino
Special Asst. Attorneys General
Lafayette, LA

Attorneys for Defendant-Appellee,
The Board of Supervisors for the
University of Louisiana System

* * * * *

BEFORE: HIGGINBOTHAM, PENZATO, AND LANIER, JJ.

**HIGGINBOTHAM, J.**

This case involves a racial discrimination claim filed by Jerry Lee Baldwin, a former head football coach for the University of Louisiana at Lafayette (ULL), against the Board of Supervisors for the University of Louisiana System, ULL, and Nelson Schexnayder, individually, and in his capacity as Director of Athletics for ULL (collectively referred to as "ULL"). Baldwin's racial discrimination claim was dismissed after a third trial on the merits held in July 2018. Baldwin appeals.

## BACKGROUND

We are very familiar with the background of this case, as the litigation has been ongoing for almost twenty years and includes numerous writ actions and appeals before this court. Therefore, we will briefly cover the factual and procedural background and use an abbreviated recitation of evidence and testimony that has been repeated multiple times over the years.

In December of 1998, Baldwin was hired as the first African-American head football coach for ULL. On November 26, 2001, after three losing football seasons with dwindling attendance, sponsorships, and financial support, Baldwin was relieved of his duties as head coach. However, ULL continued to pay Baldwin's salary throughout the remaining term of his contract. On July 21, 2003, Baldwin filed a suit alleging various claims including breach of contract, intentional and negligent infliction of emotional distress, tortious interference with a contract, and abuse of rights. On September 17, 2004, Baldwin filed an amending and supplemental petition specifically alleging a racial discrimination claim against ULL. After three trials, voluminous motions, writ applications, and appeals, a final judgment was rendered on August 21, 2018, dismissing Baldwin's racial discrimination claim.[1] Baldwin appeals, arguing that the judgment was the product

---

[1] In 2007, Baldwin obtained a jury verdict on some of his claims stemming from his 2001 termination; however, this court reversed and remanded for a new trial due to numerous errors. **Baldwin v. Board of Supervisors for University of Louisiana System**, 2008-2359 (La. App. 1st

2

of the trial judge's erroneous application of the proper burden of proof, analysis, and procedure necessary for racial discrimination claims.

## LAW AND ANALYSIS

Under Louisiana law, it is unlawful for an employer to "[i]ntentionally fail or refuse to hire or to discharge any individual, or otherwise to intentionally discriminate against any individual with respect to compensation, or terms, conditions, or privileges of employment, *because of* the individual's race, color, religion, sex, or national origin." La. R.S. 23:332(A)(1) [Emphasis added]. Racial discrimination is also unlawful under federal law pursuant to Title VII of the Civil Rights Act of 1964 and subsequent legislation. See **McDonnell Douglas Corporation v. Green**, 411 U.S. 792, 793-794, 93 S.Ct. 1817, 1820, 36 L.Ed.2d 663 (1973). Based on the commonality between federal and state anti-discrimination laws, state courts may appropriately consider a federal court's interpretation of federal statutes to resolve similar questions concerning Louisiana statutes and the proper burden of proof sequence. **Hicks v. Central Louisiana Electric Company, Inc.**, 97-1232 (La. App. 1st Cir. 5/15/98), 712 So.2d 656, 658.

The plaintiff claiming discrimination has the initial burden of proof and must establish a *prima facie* case of discrimination. The plaintiff may meet this initial burden by showing that (1) he is a member of a racial minority; (2) he is qualified for the position; (3) he was discharged; and (4) the position was filled by a person who was not a member of the protected minority class. See **McDonnell Douglas**, 411 U.S. at 802, 93 S.Ct. at 1824. See also **St. Mary's Honor Center v. Hicks**, 509

---

Cir. 6/30/09), 2009 WL 1879476 (unpublished), writs denied, 2009-1917, 2009-1919 (La. 12/18/09), 23 So.3d 947, 948, cert. denied, 560 U.S. 926, 130 S.Ct. 3330, 176 L.Ed.2d 1222 (2010). After various other writ applications and appeals, six of Baldwin's claims were dismissed, including his breach of contract claim and all claims against Nelson Schexnayder, leaving the sole claim concerning whether ULL terminated Baldwin "because of" his race, in violation of La. R.S. 23:332. **Baldwin v. Board of Supervisors for University of Louisiana System**, 2014-0827 (La. 10/15/14), 156 So.3d 33. A second jury trial in March of 2016 ended in a hung jury. The third trial on the merits was a bench trial held in July 2018, which resulted in a final judgment dismissing Baldwin's racial discrimination claim against ULL, with prejudice, and at Baldwin's cost.

U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant employer who must articulate a legitimate nondiscriminatory reason for its action. If the defendant articulates such a reason, the plaintiff must then show by a preponderance of the evidence that the defendant's reason is mere pretext to cover up a discriminatory action. See **McDonnell Douglas**, 411 U.S. at 802-04; 93 S.Ct. 1824-25; **Vaughn v. Edel**, 918 F.2d 517, 521 (5th Cir. 1990).

At trial, Baldwin presented what he considered to be a *prima facie* case of racial discrimination. He offered evidence to show that he was an African-American, his background as a football coach that qualified him for the position of head coach at ULL, his removal from his coaching duties prior to the end of his contracted term, and his replacement by a white male. The trial court found, and we agree, that Baldwin did indeed present a *prima facie* case of discrimination.

ULL offered what it considered legitimate and nondiscriminatory reasons for Baldwin's removal as head coach. ULL pointed to the three losing seasons comprising the entirety of Baldwin's tenure, as well as the significant drop in game attendance, particularly in light of a pending NCAA rule that required a higher level of attendance for ULL to maintain its Division 1A status. Additionally, ULL provided witness testimony that the win/loss record and low attendance at games combined to create a decline in athletic sponsorships and support, which contributed to an ongoing budget crisis. For all of those reasons, ULL felt that an immediate change in the head football coaching position was necessary.

Baldwin maintains that the reasons offered by ULL were not the true reasons for his termination, but were merely pretextual to cover up racial discrimination. Baldwin presented evidence that he believed undermined ULL's claim of nondiscriminatory reasons. There was testimony that ULL realized that the team Baldwin inherited was extremely weak in terms of depth and talent, and that it would

4

take some time to turn around the football program. There was also testimony that despite the fact that Baldwin's replacement coach had two similar losing seasons, he was actually offered a contract extension instead of being terminated. Further, Baldwin attempted to show that he was treated differently than his predecessor and successor coaches in that the scheduled "money games" during his tenure were not sufficient to overcome ULL's budget crisis. Baldwin also presented considerable testimony regarding ULL's failure to replace the athletic department's marketing director and failure to support his quest for televising games and a coach's television show, which he thought would create more local interest in ULL football. Baldwin testified that he repeatedly requested repairs to an "eyesore" trophy case that negatively reflected on the football program during recruiting season. The evidence revealed that the coach's television show, better money games, a new marketing director, and the repair of the trophy case all occurred after Baldwin's tenure.

ULL presented evidence that countered Baldwin's interpretation of the facts and motives that Baldwin assigned to ULL's actions. ULL showed that Baldwin had an excellent reputation as a recruiter, and he was specifically hired to improve the football program that all acknowledged was in bad condition. Witnesses testified that the decision not to televise games was due to lack of funds, and the decision not to have the coach's television show was actually a decision made by the local station based on advertising. Witnesses further testified that money games were scheduled years in advance and did not have anything to do with the coach at the time the game was actually played. ULL witnesses also testified that any delay in the repair of the trophy case arose from the lack of funds and some missteps by a volunteer involved in the repair. According to ULL witnesses, the same lack of funds during Baldwin's coaching tenure caused the delay in the hiring of another marketing director for the athletic department; however, many improvements were made to athletic facilities during Baldwin's tenure. Finally, ULL offered testimony of many witnesses that

5

showed ULL had a long history of hiring minorities for administrative, faculty, and coaching positions. No witness, other than Baldwin himself, indicated that they had seen or heard of any kind of racial issue while Baldwin was head coach. The president of ULL, Dr. Ray Authement, made the final decision to hire and fire Baldwin. Authement specifically denied that any comments concerning race were ever made to Baldwin or about Baldwin. Authement testified that race played absolutely no part in the hiring or firing of Baldwin, and he never received any pressure to fire Baldwin because of race. The pressure was all about the losing seasons, the lack of program improvement, and the dire financial consequences of dwindling support for the football program.

The trial court heard all of the testimony, considered all of the evidence, and reviewed the voluminous exhibits and deposition testimony from the previous trials. In oral reasons for judgment, the trial court stated that the entire crux of the case centered on whether Baldwin was treated differently because of his race. The trial court found that Baldwin met his burden of setting forth a *prima facie* showing of discrimination under the **McDonnell Douglas** factors, and that ULL had met its burden of showing legitimate nondiscriminatory reasons for terminating Baldwin. The trial court then analyzed whether Baldwin had sufficiently shown, by a preponderance of the evidence, whether the reasons set forth by ULL were merely a pretext or a cover up of racial discrimination. The trial court stated that while it was clear that Baldwin believed or perceived that his firing was due to racial factors, the evidence simply did not support that belief. The trial court found that both Baldwin and Authement were credible witnesses; however, the trial court concluded that the evidence fully supported the legitimate reasons provided by ULL for the termination of Baldwin's tenure as ULL's head football coach. The trial court noted that the witnesses presented almost unanimous and overwhelming evidence that race was not a factor in Baldwin's termination.

6

Baldwin makes much of the fact that when reciting oral reasons for judgment, the trial court misstated the evidentiary burden of proof as "beyond a reasonable doubt" rather than by a "preponderance of the evidence" or "more likely than not." Baldwin argues that this was reversible error, which requires this court to conduct a *de novo* review. See **Jones v. Black**, 95-2530 (La. 6/28/96), 676 So.2d 1067, 1067 (where the fact-finding process has been tainted by some material legal error and the record is complete, the appellate court renders judgment on the record). However, our review of the trial court's oral reasons reveals that when the mistake was pointed out by opposing counsel, the trial court immediately apologized and stated that "preponderance of the evidence" is the standard that the trial court used. Thus, we find no merit to Baldwin's argument.

Baldwin also asserts that the trial court failed to properly analyze the facts using the **McDonnell Douglas** framework for determining whether there was racial discrimination involved in Baldwin's termination. Again, we find no merit to Baldwin's assertions. The trial court expressly stated that the **McDonnell Douglas** analysis was used in evaluating the evidence and correctly outlined the matter for decision: Whether Baldwin could show that ULL's legitimate and nondiscriminatory reasons for his firing are a mere pretext to cover up a racial motivation for the termination. Despite the shifting of burdens under the **McDonnell Douglas** analysis, the ultimate burden remains with the plaintiff to show that the true reason for the adverse employment action was an impermissible discriminatory factor. See **St. Mary's Honor Center**, 509 U.S. at 508, 113 S.Ct. at 2747-48.

The trial court found that Baldwin failed to show that race was the true reason for his termination; rather, ULL terminated Baldwin because of his losing record, as well as declining attendance and income that was jeopardizing ULL's Division 1A status. After thoroughly reviewing the evidence presented, we cannot find any manifest error in the trial court's determination. The trial court's ruling is reasonably

7

supported by the record and should be affirmed.  <u>See</u> **Stobart v. State through Dept. of Transp. and Development**, 617 So.2d 880, 882 (La. 1993).  Moreover, after a discrimination case has been fully tried, the burden-shifting analysis ceases to be of paramount importance to the appellate court.  Instead, the inquiry becomes whether the record contains sufficient evidence to support the conclusions reached by the factfinder.  <u>See</u> **Seagrave v. Dean**, 2003-2272 (La. App. 1st Cir. 6/10/05), 908 So.2d 41, 45, <u>writ denied</u>, 2005-2349 (La. 3/17/06), 925 So.2d 543, and <u>cert. denied</u>, 549 U.S. 822, 127 S.Ct. 157, 166 L.Ed.2d 38 (2006).

## CONCLUSION

Finding no reversible error in the trial court's August 21, 2018 judgment dismissing Jerry Lee Baldwin's racial discrimination claim against the Board of Supervisors for the University of Louisiana System at his cost, we hereby affirm that final judgment.  All costs of this appeal are assessed to plaintiff-appellant, Jerry Lee Baldwin.

**AFFIRMED.**